UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                Plaintiff,

v.                                              Case No. 22-cv-1127-pp

WHITNEY PITZLIN, ALLISON HOHENSTERN,
JESSICA HOSFELP, JENNA HILAND,
ASHLEY HASELEU, ROBERT WEINMAN,
DR. JEAN PIERRE, RN VICK GWENDOLYN
and ANN YORK,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING AS MOOT PLAINTIFF'S SECOND MOTION TO WAIVE PAYMENT OF INITIAL PARTIAL FILING FEE (DKT. NO. 15) AND SCREENING COMPLAINT**

Timothy Durley, who is incarcerated at Waupun Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants failed to provide adequate medical treatment and retaliated against him. This decision resolves the plaintiff's motions for leave to proceed without prepaying the filing fee and to waive payment of the initial partial filing fee, dkt. nos. 2, 15, and screens his complaint, dkt. no. 1.

**I.    Motions for Leave to Proceed without Prepaying the Filing Fee and to Waive Payment of the Initial Partial Filing Fee (Dkt. Nos. 2, 15)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the

1

plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On October 17, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $1.87 by November 7, 2022. Dkt. No. 12. On October 26, 2022, the plaintiff filed a motion asking the court to waive payment of the initial partial filing fee. Dkt. No. 13. On November 17, 2022, the court issued an order denying that motion. Dkt. No. 14. The court explained that "although [the plaintiff] does not currently have the *assets* to pay the initial partial filing fee, he does have the *means*—his loved ones who have sent him money in the past and who asked him if he wanted them to send him more money." Id. at 3. The court ordered the plaintiff to either voluntarily dismiss this lawsuit and refile it later or pay the $1.87 initial partial filing fee by December 2, 2022. Id. at 5–6.

On November 30, 2022, the plaintiff filed a second motion asking the court to waive the requirement that he pay the initial partial filing fee. Dkt. No. 15. He insists that the court "misinterpreted" his letter about his ability to pay the filing fee. Id. at 1. He says only one person has been sending him money, and that money is immediately deducted from his institutional account to pay his outstanding legal loan debts, to pay into his release account and to pay the outstanding fees from his previous civil cases. Id. at 1–2. He says he is left with "any where from 'cents' to nothing," so he remains unable to pay the $1.87 initial partial filing fee. Id. at 2.

Despite the plaintiff's second motion insisting that he was unable to pay the initial partial filing fee, the court received the $1.87 payment on December 8, 2022.[1] The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order. The court will deny as moot the plaintiff's second motion to waive payment of the initial partial filing fee.

## II. Screening the Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison,

---

[1] The same day, the court received payment of the $2.45 initial partial filing fee in another of the plaintiff's cases, Case No. 22-cv-1293. The plaintiff also had filed a motion in that case asking the court to waive payment of the initial partial filing fee. Case No. 22-cv-1293, Dkt. No. 23.

668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The complaint names several defendants who work at Waupun: registered nurses Whitney Pitzlin, Allison Hohenstern, Jessica Hosfelp, Jenna Hiland, Ann York and Vick Gwendolyn; Doctor Cheryl Jeanpierre; Health Services Manager Robert Weinman; and Health Services Unit (HSU) Assistant

4

Manager Ashley Haseleu. Dkt. No. 1 at 1–2. The plaintiff sues the defendants in their individual capacities. Id. at 1.

The plaintiff alleges that in June 2022, he was in the restricted housing unit at Waupun. Id. at 4. He says that on June 16, 2022, he was bitten by a "greyish looking" spider. Id. The plaintiff experienced severe pain, numbness and aches in his left foot; the plaintiff does not say so, but the court assumes that this is where the spider bit him. Id. He wrote to the HSU to be seen "for this." Id. On June 21, 2022, Dr. Jeanpierre saw him about his asthma, and he says he mentioned the spider bite and his resulting symptoms. Id. Jeanpierre examined the plaintiff's foot but told him she saw "nothing wrong with it." Id. (The plaintiff describes himself as a man of "darker hue," and says that he doesn't really know where the spider bit him, only that he felt pain, ache and numbness in his left foot. Id.) Jeanpierre told the plaintiff she would not prescribe him anything for his foot "due to [his] complaints [he] made against her in the pas[t], and [his] lawsuites [*sic*] [he] filed against her." Id. at 4–5. She allegedly told the plaintiff to "file another lawsuite [*sic*] against [her]," then stated, "we're done here." Id. at 5. The plaintiff asserts that despite his telling Jeanpierre that he was bitten by a spider (and how he'd looked down, seen the spider and killed it), and despite his description of the pain, ache and numbness in his left foot, Jeanpierre did nothing for him. Id.

On June 23, 2022, the plaintiff saw Nurse Pitzlin about the continuing pain and numbness in his left foot. Id. He told Pitzlin about his previous appointment with Jeanpierre, and Pitzlin examined the plaintiff's foot. Id. He

5

told her that ibuprofen and Excedrin were not relieving his pain.[2] Id. Pitzlin allegedly told him there was nothing she could do for him and advised him to "try to stay off [his] foot." Id. The plaintiff again saw Jeanpierre about an hour later as she was at another prisoner's cell. Id. He told Jeanpierre he had seen Pitzlin and had told her about the spider bite and his continuing pain and numbness, as well as the fact that the ibuprofen and Excedrin weren't working. Id. Jeanpierre told the plaintiff she would talk to Pitzlin and come back to talk to him, but she never returned. Id.

On July 5, 2022, the plaintiff spoke with Nurse Hiland as she was passing out medication to the individual in the neighboring cell. Id. at 5–6. He asked Hiland if she could see him due to the spider bite; he recounted his pain, his discussions with other medical providers and the ineffectiveness of ibuprofen and Excedrin. Id. at 6. Hiland told the plaintiff she could not do anything for him and that he should "fill out a blue slip for 'hsu.'" Id. The plaintiff explained he had been submitting those slips but that the HSU "[was] not pulling [him] out, to see [him]." Id. Hiland replied, "sorry can[']t do nothing, you got to wait to be seen by 'hsu'" and walked away. Id.

On July 6, 2022, the plaintiff saw Nurse Hohenstern about his spider bite. Id. Hohenstern examined the plaintiff's left foot, touched it and asked the plaintiff if he could feel the contact. Id. The plaintiff told her he could not feel anything from the halfway point on the sole of his foot to the back of his

---

[2] The plaintiff alleges that neither Jeanpierre nor Pitzlin provided medication for his foot, so it is unclear where he got the ibuprofen and the Excedrin.

heel/ankle, explained the pain and numbness he had been experiencing, explained how the analgesics weren't working and told her about his past discussions with the other nurses and Jeanpierre. Id. Hohenstern told the plaintiff his foot did not look swollen and that there was nothing more she could do, and she advised him to stay off his foot. Id.

The plaintiff asserts that Health Services Manager Weinman did nothing for him even after he wrote Weinman letters telling him about his discussions with the nurses regarding the spider bite, his ongoing pain and the effect the pain was having on his daily activities. Id. at 6–7. The plaintiff says Weinman responded to his HSU request but took no other action. Id. at 7. The plaintiff similarly alleges that Nurses York and Gwendolyn responded to his requests for HSU treatment for his spider bite, but they "did nothing." Id. He says Haseleu knew about his spider bite because she "had looked upon the computer in [his] 'hsu' notes concerning the spider bit[e]" and responded to his HSU requests, but she "failed to do anything." Id.

The plaintiff alleges that on August 4, 2022, he stopped Nurse Hosfelp as she was performing rounds and asked her to "pull [him] out to be seen for [his] spider bit[e]." Id. He told her about his pain, his previous appointments and the HSU's refusal to pull him from his cell or prescribe medication. Id. Hosfelp told him she could not pull him from his cell "due to your 3man restriction" and that she could not "prescribe [him] nothing." Id. at 7–8. Hosfelp left without doing anything. Id. at 8.

The plaintiff attached to his complaint reports from three institutional complaints he filed about his spider bite. Dkt. No. 1-1. The first report relates to a complaint he filed on June 27, 2022 (eleven days after he alleges the spider bit him). Id. at 1. Haseleu reviewed this complaint and reported to the complaint examiner, "There is no documentation of him seeing the doctor for this issue, he did see nursing." Id. The complaint examiner noted that the HSU saw the plaintiff on June 23 and July 6, 2022. Id. The complaint examiner concluded that the plaintiff had been seen for the issue, and that "[i]t does not appear his health care concerns are being ignored." Id. The complaint examiner advised the plaintiff to cooperate with HSU staff and recommended dismissing the complaint. Id. On August 6, 2022, the reviewing authority accepted the complaint examiner's decision and dismissed the complaint. Id. at 2. Both the corrections complaint examiner and the Office of the Secretary agreed with the complaint examiner's report and dismissed the plaintiff's appeal from the dismissal of his complaint. Id. at 4–5. The Office of the Secretary noted that the plaintiff "has been seen multiple times" and advised him to notify the HSU "[i]f his condition has not improved." Id. at 5.

The plaintiff filed the other two complaints about his spider bite on July 5 and August 4, 2022—before his first complaint on this issue had been fully resolved. Id. at 6, 11. An institutional complaint examiner recommended rejecting both complaints because they raised the same issue as his June 27, 2022 complaint. Id. at 7, 13. The reviewing authority accepted those recommendations and dismissed both complaints as duplicative. Id. at 10, 15.

The plaintiff also filed declarations from two other persons incarcerated at Waupun. Dkt. Nos. 4, 5. Kurtis Jones avers that he has seen "flies, centipedes, silver fish and all kinds of pests including bats and birds in [his] cells" at Waupun since 2019. Dkt. No. 4. He says Waupun staff do not properly clean cells, which are contaminated with "mold, years of caked up dust, dirt and dibree [*sic*]." Id. Jones says nothing about the plaintiff or spiders or the plaintiff's alleged spider bite. James Newman avers that on June 16, 2022, he heard the plaintiff tell a nurse about his spider bite. Dkt. No. 5. He says the nurse told the plaintiff to "put in blue slip" and did not pull the plaintiff out of his cell for an examination. Id. He says the plaintiff continuously complained about his pain, which concerned Jones because Jones also has seen spiders in his cell. Id.

The plaintiff seeks compensatory damages for each day the defendants failed to treat his spider bite and punitive damages for his pain and suffering. Dkt. No. 1 at 8, 12. He also asks that the court remove the "strikes" he has incurred in two past cases, Case Nos. 21-cv-281 and 21-cv-153. Id. at 8, 12.

C. Analysis

The court reviews the plaintiff's allegations regarding the denial of proper medical care for his spider bite under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations

omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the plaintiff must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103. To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 776 (citing Farmer, 511 U.S. at 837).

The plaintiff alleges that Dr. Jeanpierre and several nurses were deliberately indifferent to the pain, aching and numbness that resulted from a spider bite that he suffered on June 16, 2022. Although he wrote to the HSU about this spider bite a day later, the plaintiff alleges that he was not seen for treatment for five days after the incident. The plaintiff says he saw Dr. Jeanpierre on June 21, 2022, to discuss his asthma. He says he mentioned the spider bite during that appointment, and Jeanpierre examined his foot but refused to provide further treatment. He says he again mentioned his foot to

Jeanpierre in passing a few days later, but she again failed to provide any treatment. Nurses saw him for his spider bite a few times over the following weeks and months.

The Court of Appeals for the Seventh Circuit has concluded that "a two-centimeter, day-old insect bite" is not a sufficiently serious medical issue because it is not a kind of medical condition that "would be obvious to a layperson." Jellis v. Hulick, 422 F. App'x 548, 550 (7th Cir. 2011) (citing case examples of conditions that a layperson would find obviously serious); see also Fryer v. Ledvora, No. 14 C 9199, 2017 WL 36445, at *5 (N.D. Ill. Jan. 4, 2017) (noting that "[c]ourts have been reluctant to hold that a spider bite is a serious medical need" and citing cases (quotation omitted)). Although the plaintiff alleges that he experienced pain and numbness in his foot, he says no medical professional who examined him found evidence of a bite. Nor did any medical professional note swelling in his foot or any other symptoms (such as drainage, fever and so on) to suggest his perceived insect bite was serious. He concedes that he is not sure where the spider bit him. The court finds that the complaint's allegations about the plaintiff's spider bite and resulting pain and numbness do not satisfy the objective component of an Eighth Amendment claim.

Even if the plaintiff's injury were serious, his allegations fail to show that any defendant deliberately disregarded it. The plaintiff says Dr. Jeanpierre refused to treat him because of his past complaints. The court will address that claim in detail below. The plaintiff alleges that Nurses Pitzlin, Hiland,

Hohenstern and Hosfelp examined him or discussed his concern about his spider bite and the pain and numbness he was feeling. He says those nurses did not adequately treat his symptoms, which affected his daily activities. The allegations show each nurse was subjectively aware of the plaintiff's spider bite and mild symptoms. But they do not suggest the defendants were deliberately indifferent to his bite or that they disregarded his pain.

Nurse Pitzlin saw the plaintiff for an appointment about his foot. She examined his foot but determined there was nothing more that she, as a nurse, could do. She advised the plaintiff to try to stay off his sore foot. Although the plaintiff may be dissatisfied with the result of this appointment, that dissatisfaction does not show that Pitzlin was deliberately indifferent to his foot pain. See Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021) (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)) (noting that "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to state an Eighth Amendment claim). At most, the plaintiff's allegations suggest Pitzlin may have been negligent. But negligence is not enough to state an Eighth Amendment claim. See Farmer, 511 U.S. at 835–36; Estelle, 429 U.S. at 106. The court will dismiss Pitzlin as a defendant.

The plaintiff also saw Nurse Hohenstern for treatment. Hohenstern examined the plaintiff's foot, performed a test to determine the feeling in his foot and determined that his foot did not appear swollen. Based on the tests and observations, she told the plaintiff there was nothing more she could do and, like Ptizlin, advised him to stay off his sore foot. As with the claim against

Pitzlin, these allegations do not show deliberate indifference. They instead show a nurse who examined the plaintiff but was unable to find a cause for his reported pain. As explained above, this shows no more than patient dissatisfaction or medical negligence, neither of which violate the Eighth Amendment. The court will dismiss Hohenstern.

The plaintiff did not have an appointment with Nurse Hiland. He alleges only that he spoke with her as she was passing out medication. Hiland told the plaintiff she could not do anything for him at that time and advised him to submit a blue slip to be seen in the HSU. She told him he would have to wait to be seen in the HSU. This was not an unreasonable response to the plaintiff's request. Hiland was not examining patients; she was passing out medication. She told the plaintiff to request treatment in the HSU, which is the proper procedure for incarcerated persons who seek medical treatment. The plaintiff's dissatisfaction with the time he had to wait for an appointment does not show that Hiland was deliberately indifferent for not giving him preferential treatment. Having to wait for non-emergency medical treatment is a fact of life (for incarcerated and non-incarcerated persons alike); it is not a constitutional violation. See Moore v. Williams, 835 F. App'x 143, 145 (7th Cir. 2021) (citing Knight v. Wiseman, 590 F.3d 458, 466 (7th Cir. 2009)) (noting that "the Constitution does not mandate immediate care."). The court will dismiss Hiland from this case.

The plaintiff did not have an appointment with Nurse Hosfelp; he stopped her as she was performing rounds in the prison to complain about his pain and

his previous appointments. He asked her to pull him out of his cell to examine him and prescribe medication. Hosfelp explained that she could not have him removed from his cell because he was on a three-man restriction, and she explained that she could not prescribe him medication. The court is aware from the plaintiff's several previous cases that the three-man restriction means the plaintiff cannot be removed from his cell without security escorts unless there is an emergency. See, *e.g.*, Case No. 22-cv-585-WED, Dkt. No. 14 at 8. That means Hosfelp correctly told the plaintiff that she lacked the authority to have him removed from his cell because he was not demonstrating an emergent medical need. The court also is aware that registered nurses cannot prescribe medication; only an advanced care provider (such as a nurse practitioner or a doctor) can write prescriptions. That means Hosfelp also correctly told the plaintiff she could not write him a prescription. His recourse to address his pain and receive medication was to file an HSU request, as several nurses told him to do. The plaintiff's failure to follow those policies does not show that Hosfelp (or any other defendant) was deliberately indifferent to his medical need. The court will dismiss Hosfelp as a defendant.

Defendants Weinman, York, Vick and Haseleu did not see, speak with or examine the plaintiff. They merely responded to his requests for treatment in the HSU and, according to the plaintiff, took no further action. The plaintiff did not attach any of those defendants' responses to his HSU requests. But the plaintiff had appointments about his foot with Dr. Jeanpierre and Nurses Pitzlin and Hohenstern. The responses to his institutional complaints also

show he was seen about his foot on multiple occasions. The court cannot reasonably infer that the defendants who responded to his HSU requests did nothing; someone referred the plaintiff for an appointment with a treating nurse or doctor or advised the plaintiff to follow the instructions and recommendations from his previous appointments. Because Weinman, York, Vick and Haseleu did not examine the plaintiff or provide treatment, there is nothing more they could or should have done in response to the plaintiff's requests for treatment. As noted, his dissatisfaction with the time he had to wait for an appointment does not constitute deliberate indifference. The court also notes that administrators like Weinman "are ordinarily not personally liable for decisions made by subordinates, even if they receive a letter complaining about those decisions and do not intervene." Courtney v. Devore, 595 F. App'x 618, 620 (7th Cir. 2014) (citing Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009)). That Weinman received letters from the plaintiff about his inadequate treatment does not suggest that Weinman was deliberately indifferent to the plaintiff's symptoms. The court will dismiss these non-treating defendants and will not allow the plaintiff to proceed on a claim under the Eighth Amendment.

The plaintiff also asserts that Dr. Jeanpierre retaliated against him when she refused to treat his spider bite because of his past complaints and lawsuits that he filed against her. The court analyzes these allegations under the First Amendment. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). To state a claim of retaliation, the plaintiff must allege that "he engaged in a protected

15
Case 2:22-cv-01127-PP   Filed 01/27/23   Page 15 of 20   Document 17

activity," "he suffered a deprivation likely to prevent future protected activity" and "his protected activity was a motivating factor in the defendants' decision to retaliate." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citing Perez, 792 F.3d at 783).

The plaintiff's allegations satisfy the first of these elements. The filing of previous complaints and lawsuits generally constitutes protected activity. See Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020) (complaints); Harris v. Walls, 604 F. App'x 518, 521 (7th Cir. 2015) (citing Hasan v. U.S. Dep't of Labor, 400 F.3d 1001, 1005 (7th Cir. 2005)) (lawsuits).

The court applies an objective test to determine whether the plaintiff's allegations satisfy the second element: "'whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.'" Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (quoting Surita v. Hyde, 665 F.3d 860, 878 (7th Cir. 2011)). Because this standard is objective, "a specific plaintiff's persistence does not undermine his claim." Id. (citing Holleman, 951 F.3d at 880). The court finds that denying a prisoner medical treatment because he has filed past complaints or lawsuits would likely deter him from continuing to engage in those protected activities. The complaint satisfies this second element.

To prove the third element, the plaintiff must show more than that the defendant's action occurred after his protected activity. He must show that the defendant knew about his protected conduct and acted because of it. See Healy v. City of Chi., 450 F.3d 732, 740–41 (7th Cir. 2006). In other words, the

16
Case 2:22-cv-01127-PP   Filed 01/27/23   Page 16 of 20   Document 17

plaintiff must show that the protected activity was "a 'but-for' cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." Nieves v. Bartlett, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019); see Winston v. Fuchs, 837 F. App'x 402, 404 (7th Cir. 2020). The complaint alleges that Jeanpierre specifically mentioned the plaintiff's past complaints and lawsuits as her reason for refusing to treat his sore foot. She allegedly encouraged him to file another lawsuit against her. The court finds these allegations are sufficient to show that Jeanpierre knew about the plaintiff's past protected activity and refused him medical treatment because of that protected activity. The court will allow the plaintiff to proceed on a First Amendment claim of retaliation against Jeanpierre.

The plaintiff seeks both damages and removal of the two strikes this court has imposed on him in Case Nos. 21-cv-281 and 21-cv-153. The court dismissed Case No. 21-cv-281 on April 28, 2021. Case No. 21-cv-281, Dkt. No. 8. The plaintiff did not file a post-judgment motion or appeal the court's judgment. The court dismissed Case No. 21-cv-153 on July 20, 2022. Case No. 21-cv-153, Dkt. No. 15. The plaintiff timely moved to alter or amend the judgment. Dkt. No. 17. The court denied that motion on September 27, 2022. Dkt. No. 20. The plaintiff did not timely appeal. He since has moved for relief from the judgment. Dkt. No. 21. That motion remains pending.

The court will not allow the plaintiff to seek alteration of the judgment in his past cases or to otherwise litigate a past case through this lawsuit (or any future lawsuit) under §1983. The plaintiff's recourse to challenge a judgment in

a past case was to file a post-judgment motion, as he has in Case No. 21-cv-153, or to appeal the court's judgment, which he did not do in either case and which it is now too late to do. See Federal Rule of Appellate Procedure 4(a)(1)(A). The plaintiff may seek relief only in the form of damages.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES AS MOOT** the plaintiff's second motion to waive payment of the initial partial filing fee. Dkt. No. 15.

The court **DISMISSES** defendants Whitney Pitzlin, Allison Hohenstern, Jessica Hosfelp, Jenna Hiland, Ann York, Vick Gwendolyn, Robert Weinman and Ashley Haseleu.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendant Cheryl Jeanpierre. Under the informal service agreement, the court **ORDERS** defendant Jeanpierre to respond to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$348.13** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2).

The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Waupun Correctional Institution.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[3] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

---

[3] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 27th day of January, 2023.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**